[No. 1697.]

## THE STATE OF NEVADA, RESPONDENT *v.* JOHN H. HENNESSY, APPELLANT.

1. HOMICIDE—DYING DECLARATIONS—SENSE OF IMPENDING DEATH. Where, on a trial for murder, it was shown that decedent, directly after the shooting said: "Boys, I am mortally wounded; I am all in"; and then made a statement with respect to the circumstances of the killing, and that death followed within a little over two days, a sufficient predicate was laid for the admission of the statement as a dying declaration.

2. SAME—EVIDENCE—ADMISSIBILITY—THREATS. Where, on a trial for murder, it was contended that defendant acted, not only in defense of himself, but also in defense of another, it was competent to show threats made against the life of such other by decedent or by others in association with him, and that the threats were communicated to defendant, though no threats were made against defendant.

3. SAME—JUSTIFIABLE HOMICIDE—DEFENSE OF ANOTHER. Where one believes as a reasonable man that another who has been assaulted is in danger of losing his life, or of suffering great bodily harm, he has the same right to defend such other as the latter would have to defend himself.

4. CRIMINAL LAW—TRIAL—INSTRUCTIONS—DUTY OF JUROR. An instruction requested on a criminal trial that if, after a consideration of the whole case, any juror should entertain a reasonable doubt of defendant's guilt, it was his duty not to vote for a verdict of guilty, nor to be influenced to so vote for the single reason that a majority of the jury might be in favor of a verdict of guilty, if given, should be first modified so as not to admit of the construction that it was a juror's duty to hold to his convictions, which might in fact be based upon an erroneous view or misconception of the law or the evidence, and so as to embody the idea that it was the duty of each juror to consult with his fellows, and to consider their views, to the end that each might aid in arriving at the truth.

5. HOMICIDE—INSTRUCTIONS—DEFENSE OF ANOTHER. A requested instruction, on a trial for murder, wherein it was contended that the killing was in defense, not only of defendant, but also of another, that the law makes it the duty of every one who sees a felony attempted by violence to prevent it, if possible, and that one may kill in the defense of another under the same circumstances that he would have a right to kill in defense of himself, should have been given, notwithstanding an instruction was given which was substantially the statutory definition of justifiable homicide.

6. SAME. Comp. Laws, 4751 (Crimes and Punishments Act, sec. 110), which, after defining the crime of conspiracy, provides that no part of the act shall be construed. to restrict or prohibit the orderly assembling or coöperation of persons employed in any trade or handicraft for the purpose of securing an advance in the rate of wages or for the maintenance of such rate, did not authorize an instruction that if decedent and others went to the mine where the homicide occurred in an orderly manner for the purpose of maintaining a rate of wages, and to induce another in an orderly manner, without violence, to work for that wage, their purpose was lawful, for such question was not involved in this case.

APPEAL from the District Court of the Third Judicial District of the State of Nevada, Nye County; *Peter Breen*, Judge.

John H. Hennessy was convicted of manslaughter, and from the judgment and an order denying a new trial, he appeals. **Reversed,** and remanded for new trial.

The facts sufficiently appear in the opinion.

*J. P. O'Brien*, for Appellant:

I.   The prosecution has wholly failed to show that Ganahl believed that he was in great danger, or that he entertained any fear that he would die, or that he had abandoned all hope of recovery. It will be observed that the statement was made a very few minutes after the homicide, and long before he had received medical attendance, and that he did not and could not know the extent of his injuries, or whether or not his wound was fatal. Under these circumstances we submit that the prosecution failed to show that Ganahl believed that he was about to die, or that he had abandoned all hope of recovery. Besides, the evidence shows that the statement of Ganahl was reduced to writing and signed by him. We submit that the written declaration is the best and only evidence, and that it was error, therefore, for the trial court to permit the witnesses to narrate the alleged statement or declaration made by Ganahl. (10 Am. & Ency. Law, 391, 2d ed. and cases cited.)

II.   In capital cases, past threats and hostile actions or antecedent circumstances tending to show malice are admissible in connection with the homicide, for the purpose of showing apprehension of personal danger from the deceased

and of illustrating the question which of the parties, in a sudden reëncounter or quarrel in which human life has been taken may have been the assailant. (*People* v. *Travis*, 56 Cal. 251; *People* v. *Thomson*, 92 Cal. 507; *People* v. *Dye*, 75 Cal. 108; *People* v. *Lee Chuck*, 74 Cal. 30; *In re Neagle*, 135 U. S. 1–42.) In discussing this question, the Supreme Court of California, in the case of *People* v. *Thomson, supra,* says: "Again, in this case, a deadly encounter took place; one party was killed; the survivor insists that the killing was in self-defense, and that the deceased made the first attack. Who was the aggressor, was an issue of vital importance to the jury; justice could only be reached by its proper solution, and, as disclosed by the evidence, it was enveloped in doubt.   Under these circumstances, all the acts and conduct of the deceased, either in the nature of overt acts of hostility, or threats communicated or uncommunicated, were proper evidence to be considered by the jury as shedding light—to some extent, at least—upon the issue as to whether the deceased or the defendant was the aggressor in the fatal affray.   These principles are elementary in criminal law, and a citation of authorities not demanded; but the general principles are found discussed in *People* v. *Arnold*, 15 Cal. 479; *People* v. *Scoggins*, 37 Cal. 677; *People* v. *Travis*, 56 Cal. 252; *People* v. *Tamkin*, 62 Cal. 469." See, also, *People* v. *Sortor*, 34 Pac. 1037; *State* v. *Tarter*, 37 Pac. 53.   For these reasons, we submit that the threats made by Ganahl were clearly admissible and the rulings of the court in excluding them were improper.

III.   The conspiracy element of a crime becomes important only as a means of establishing the commission of a crime.   It is in this view that evidence is admitted to show conspiracy and that instructions defining it are given. (*People* v. *Holmes*, 118 Cal. 444.)   The question of whether or not there was a conspiracy, and who were the conspirators, are conclusions of fact and are entirely questions for the jury to determine from all the evidence. (*People* v. *Holmes*, 118 Cal. 444; *People* v. *Lawrence*, 143 Cal. 148; *People* v. *Moran*, 144 Cal. 48; *People* v. *Murphy*, 146 Cal. 502.)

IV.   The trial court was of the opinion that because appel-

lant was on trial for the killing of Ganahl, it was therefore incompetent for him to show any threats or overt acts of hostility or antecedent circumstances tending to show malice on the part of Cole or Fancher, and for this reason sustained the objections of the district attorney to this testimony. We submit, however, that this testimony was competent and admissible, and that the rulings of the court in excluding it were erroneous. The rule is that all facts that go either to sustain or impeach a hypothesis logically pertinent are admissible. And Wharton, in his work on Criminal Evidence, says: "No fact is relevant which does not make more or less probable such a hypothesis. Relevancy, therefore, involves two distinct inquiries, to be determined by logic, unless otherwise prescribed by jurisprudence: (1) Ought the hypothesis proposed, if proven, affect the issue? (2) Does the fact offered in evidence go to sustain this hypothesis?" (Wharton on Criminal Evidence, 24). This testimony, if elicited, would show that Cole and Fancher had jumped appellant's mining ground; that appellant had had trouble with them; that there was a bitter feud existing between Cole and Fancher and appellant, and that Cole and Fancher had made threats against appellant. This, we submit, was perfectly competent and relevant, because Cole and Fancher were present and participating in the assault at the time of the homicide, and the fact that they had made threats against the defendant and that defendant had had trouble with them, would show a conviction in the mind of the defendant that he believed his life was in danger, and that they were about to carry out the threats that they had made. The condition of the defendant's mind, and the question of whether or not he believed his life was in danger, and whether the appearances were sufficient to excite the fears of a reasonable person, constitute the very essence of self-defense.

V. When a homicide is committed in defense of another the rule is that any evidence is competent to establish justification that would have been competent if the act had been committed in defense of defendant's own person. (4 Elliot on Evidence, note to section 3041a; *State* v. *Felker*, 27 Mont. 451, 71 Pac. 668; *People* v. *Curtis*, 52 Mich. 616, 18 N. W.

385; *Wood* v. *State*, 128 Ala. 272, 29 South. 557; *State* v. *Austin*, 104 La. 409, 29 South. 23; *State* v. *Foster*, 49 S. W. 747.) The law applicable to the defense of another is fully considered by the Supreme Court of Montana in the case of *State* v. *Felker*, *supra*, and the court says: "The defendant offered evidence tending to show that during the year 1900 and prior to November 30th, the date at which the deceased had assaulted his wife with a knife, he made two other felonious assaults upon her, and that defendant had knowledge of them. This offer was made upon the theory that the homicide was justifiable since it was done in resisting an attempt to commit murder upon a third person, and any fact which would have been competent for this jury to consider, had the alleged assault out of which the homicide grew been made upon the defendant himself, was competent evidence to sustain his defense in this case. The court excluded the evidence, and the defendant assigns error."

VI. The law makes it the duty of everyone who sees a felony attempted by violence to prevent it, if possible, and allows him to use the necessary means to make his resistance effectual. (*People* v. *Travis*, 56 Cal. 251–258; *In re Neagle*, 135 U. S. 1, 42, 54, 80; 21 Am. & Eng. Ency. Law, 207; 25 Id. 274.) The doctrine of self-defense applies to one defending another, and he may act upon appearances in defending another the same as he would in defending himself. In discussing this question, the Supreme Court of Kentucky, in the case of *Stanley* v. *Commonwealth*, 85 Ky. 440, 9 Am. St. Rep. 305, says: "It is a general rule that whatever a person may lawfully do in his own defense another may do for him. Mr. Bishop, in speaking of the right to assist others in defense of person and property, says: 'The doctrine here is that whatever one may do for himself he may do for another; * * * and on the whole, though distinctions have been taken and doubts expressed, the better view plainly is, that one may do for another whatever the other may do for himself.' (1 Bishop on Criminal Law, 877.) * * * It is the duty of a man who sees a felony attempted by violence to prevent it if possible. This is an active duty, and hence he has the legal right to use the means necessary to make

the resistance effectual. If A be unlawfully assaulted by B, and his life thereby endangered, he may, by reason of not being in fault, defend it even to the extent of taking the life of the person who is in fault; and, as the right is a natural one, rules of law restricting it must, in order that it may still be effective, be adapted to his character and nature. He may, therefore, act upon appearances if he acts reasonably; and if assailed by another and he believes, and has reasonable ground to believe, that his life is thereby endangered, he may even take life in its apparent necessary defense. * * * Not only, however, may he do this, but another may do it for him. This other person in such a case steps into the place of the assailed; and there attaches to him, not only the rights, but also the responsibilities, of the one whose cause he espouses. If the life of such person be in immediate danger, and its protection requires life for life, or if such danger and necessity be reasonably apparent, then the volunteer may defend against it even to the extent of taking life, provided the party in whose defense he acts was not in fault. * * * In other words, as the person not in fault may, if he believes, and has reasonable grounds to believe, that his life is in immediate danger, defend it to the extent of taking life, so another may act upon like appearances as to such danger and defend it for him to the same extent. Here a felony is attempted; and in killing the attempter, through the necessity to save an innocent person, the one so doing is in the condition of *se defendendo* in defending the one not in fault. In such a case the doctrine of self-defense in all its principles extends to the accused, just as it would if the felony had been attempted upon him, or as it would apply to the one in danger if he had done the killing." To the same effect are: 25 Am. & Eng. Ency. Law, 274; Wharton's Criminal Law, 495; *State* v. *Sumner*, 74 Am. St. Rep. 736.

VII. The court erred in refusing to give the following instruction, presented and requested by the defendant, and designated by him as instruction No. 27: "A conspiracy exists when two or more persons conspire to commit an unlawful act, or to commit a lawful act by unlawful means.

No person has any right, by violence or unlawful means, to prevent another from exercising a lawful trade or calling, or from doing any other lawful act; and if two or more persons conspire together to prevent another person, by violence or unlawful means, from exercising a lawful trade or calling, or from doing any other lawful act, and while engaged in carrying out such conspiracy, they, the conspirators, commit a felony, or some other unlawful act not amounting to a felony, then I charge you that they are all liable for the acts of any of their number done in pursuance of such conspiracy." This is a full and complete definition of conspiracy, as applied to the facts in this case, and should have been given. (*People* v. *Holmes*, 118 Cal. 444; *Spies* v. *People*, 3 Am. St. Rep. 320; *Mussel Slough Case*, 6 Sawy. 612.)

VIII. The court erred in refusing to give the following instruction presented and requested by the defendant, and designated by him as instruction No. 28: "A conspiracy may, and generally must be, proved by circumstances." This instruction was proper and should have been given. (*People* v. *Moran*, 144 Cal. 55; *Spies* v. *People*, 3 Am. St. Rep. 320; *Mussel Slough Case*, 6 Sawy. 612.)

IX. The court erred and misdirected the jury in giving instruction No. 2 presented by and given at the request of the plaintiff. This instruction, we submit, is not a correct statement of the law, because the jury were, in express terms, told that they must believe the testimony of a witness, who had wilfully sworn falsely to a material matter in the case, if he was corroborated by other evidence or by certain facts and circumstances proven on the trial. This clearly invades the province of the jury, and is error. An instruction that the jury are not at liberty to disregard the testimony of witnesses when corroborated is erroneous. (*People* v. *Compton*, 123 Cal. 409; *People* v. *Ekert*, 16 Cal. 111.)

X. The verdict is contrary to law. Inasmuch as appellant was not permitted by the trial court to fully and fairly present all of the facts constituting his defense, we submit that the verdict is against law. It is the constitutional privilege of the defendant to stand upon his strict legal rights and be tried according to law. If there is any error in the

record, it is presumed to be injurious to him, and for such error he is entitled to a new trial. (*People* v. *Williams*, 18 Cal. 194; *People* v. *Eppinger*, 109 Cal. 297.)

*R. C. Stoddard*, Attorney-General, and *W. B. Pittman*, District Attorney of Nye County, for Respondent:

I.   Where declarations of an individual .are so connected with his acts as to derive a degree of credit from such a connection independently of the declaration, the declaration becomes a part of the transaction and is admissible in evidence.   The evidence in such case is not regarded as mere hearsay testimony.   It does not rest upon the credit due the declarant, but it may be admitted even though the declarant in ordinary cases would not be believed upon his oath. (*Hadley* v. *Carter*, 8 N. H. 40.)   The *res gestæ* may be defined as the circumstances which are the undesigned incidents of a particular litigated act and which are admissible when illustrated by such act.   (*Nutting* v. *Page*, 4 Gray, 584.) Declarations which constitute an essential part of the transaction in issue are admissible.   (*Jones* v. *Rigby*, 41 Minn. 530; *Corbett* v. *St. Louis Co.*, 26 Mo. App. 621; *Lindaur* v. *Meyberg*, 27 Mo. 181.)

II.   Would the appellant contend for a moment, .if a man, who was shot and believed he was dying, made an oral statement, and subsequently, recovering nearly entirely, made a written statement, and then relapsed and died, that the first statement would not be admissible because he had made a second statement which had been reduced to writing?   Surely not.   The second statement would not be admissible as it was not made in the belief of immediate and certain death, whereas the first statement would be admissible as a dying declaration and statement made in the expectation of immediate and certain death.

III.   In the cases cited by the appellant threats made by the deceased were admissible because the evidence showed that the deceased was the aggressor and that the defendant acted in self-defense.   In the case at bar the cases cited are not applicable, as there is not a syllable in the entire record on appeal or evidence adduced at the trial that would even

tend in the slightest degree to show that Ganahl was the aggressor or that the defendant acted in self-defense.

IV. The court did not err in refusing to give plaintiff's instruction No. 7. For a court to arbitrarily instruct a jury that, if they think a witness has sworn falsely to any material matter, it is their duty to distrust the entire evidence, would be almost tyrannical and would usurp their right of being the exclusive judges of the testimony. The jury are the exclusive judges of the weight of the testimony. (*State* v. *Thompson*, 21 W.Va. 746; Underhill, Cr. Ev. p. 265, sec. 215.)

V. A defendant is entitled to have instructions given to the jury embodying every legal principle applicable to his case, but not necessarily in any particular language; if given in substance they are sufficient. (*State* v. *Buralli*, 27 Nev. 41; *State* v. *Ward*, 19 Nev. 297; *State* v. *Cordelli*, 19 Nev. 319.)

VI. The court did not err in refusing defendant's instructions Nos. 26 and 27, as it was not proper to instruct the jury as to conspiracy, no conspiracy having been proven. One of the defendant's assignments of errors is that he was not permitted to prove a conspiracy. How can he ask that the jury be instructed as to a conspiracy, when he admits that none was proven? Because the court would not permit him to? Any instruction as to conspiracy would not only have been superfluous, but misleading. If any conspiracy had been proven, either by the plaintiff or defendant, it would have been very proper for the court to have instructed the jury as to the law on conspiracy, but in this case no conspiracy was proven on either side; in fact, the record shows plainly that no conspiracy existed; if any did exist it was on the part of the defendant.

*J. P. O'Brien*, for Appellant, in reply:

I. The rule is very well settled in capital cases that past threats and hostile actions, or antecedent circumstances tending to show malice are admissible in connection with the homicide for the purpose of showing apprehension of personal danger from the deceased, and of illustrating the question which of the parties in a sudden reëncounter or quarrel, in which human life has been taken, may have been the

assailant.  (*People* v. *Travis*, 56 Cal. 251; *People* v. *Thomson*, 92 Cal. 506; *State* v. *Vaughan*, 22 Nev. 302; *State* v. *Porter*, 49 Pac. 696.)

By the Court, NORCROSS, J.:

The appellant was convicted of manslaughter in the Third Judicial District Court in and for the County of Nye, under an indictment charging him with the murder of one Frank Ganahl on or about the 27th day of January, 1906, at the Town of Clifford, in said county, and upon such conviction was sentenced to serve a term of five years and nine months in the state prison.  From the judgment of conviction, and from an order denying his motion for a new trial, the defendant has appealed.

Upon the trial the defendant admitted the killing of Ganahl, but set up as a justification therefor that it was done in the defense of his own person and that of one Max Elftman.  In order to better understand some of the assignments of error hereinafter considered, it will be advantageous to refer to certain facts disclosed by the testimony, and also to quote extracts from the testimony of certain witnesses for the state and on behalf of the defendant describing the immediate facts and circumstances of the killing.

It appears from the testimony that, shortly prior to the killing of Ganahl, an association of miners was effected at Clifford for the purpose of establishing a scale of wages for the district, which association was local in its nature, and not affiliated with the Western Federation of Miners.  Of this association one George A. Cole was made the presiding officer. The evidence discloses that there was considerable friction in the district growing out of this organization.  The relationship existing between defendant (Hennessy), Max Elftman, upon whose lease the killing occurred, and certain of their friends, upon the one hand, and George A. Cole, Frank Ganahl, the deceased, and certain of their friends, upon the other, is testified to by certain witnesses as being, at the time of the killing, and prior thereto, anything but friendly. There is testimony to the effect that at the time the organization of miners was effected in the district the defendant

was not notified of the meeting and a purpose manifested by
Cole, Ganahl, and others to exclude the defendant therefrom,
although defendant testified that he was at the time, and for
many years prior thereto had been, a member of the Western
Federation of Miners. One witness for the defendant testi-
fied to a number of threats of personal violence and death
having been made by Frank Ganahl, George Cole, and one
Walter J. Fancher against the defendant, which threats were
communicated to him. There was also testimony of threats
of personal violence having been made by the same parties
against one Antone Bosse, an Italian employee of Max Elftman
who was suspected of working for less than the established
scale. A witness by the name of John Cahill testified that
upon the morning of the killing he notified the defendant
and several others, whom he testified he thought were peace-
ful citizens, that he had heard Ganahl, Cole, Fancher, and
two others talking of going to where the Italian was working
and doing him some violence; that the witness Cahill, the
defendant, and two or three others went over to where it was
expected the trouble would occur, but arrived there before
the other parties. Of those who went to the Elftman lease
with the witness Cahill, it appears that all had left the ground
excepting the defendant before the arrival of Cole, Ganahl,
and Fancher, who appeared upon the scene about the hour of
10 o'clock in the forenoon.

There is some difference in certain important particulars
in the testimony of witnesses for the state and those for the
defendant relative to the immediate circumstances leading
up to the killing, and for the purpose of illustrating this
difference we quote from the testimony of one of the prin-
cipal witnesses for the state and one for the defendant.

The witness George A. Cole testified, upon the part of
the state, as follows: "At about 10 o'clock that morning,
Ganahl, Fancher, and myself arrived at what is known as
the 'Elftman lease.' I spoke to the Italian Bosse, who was
working in a cleared away space at the edge of the shaft,
evidently going to set up a windlass frame, and said: 'Hello,
Antone.' He answered, 'Hello, George,' and I asked, 'Antone,
what wages are you receiving?' He replied, 'This man

[pointing to Mr. Elftman, who was evidently his employer], he says I am getting five dollars a day.' I answered: 'Very well, Antone, but don't work for less than the union scale.' He replied: 'George, I aint working for less than the union scale. I am not a scab.' I replied: 'Very well, Antone, but don't do it, or you will make a scab of yourself, and we will have to treat you as one.' With that I turned to leave. Elftman in the meantime was standing perhaps two paces from me, a little to my left, and Ganahl also at my left, forming a sort of an angle, the three of us, with Bosse again to my right. I turned to my right, intending to go back to work. Elftman called, saying—my back at this time was turned to all present—Elftman called, saying, 'Say, what do you mean when you say you would treat a man like a scab,' in a very irritable, angry tone of voice. I replied that when a man is treated like a scab his name is posted in all the union camps of the country as a man who would work for less than union wages, and he is thereby embarrassed in the way of securing work, socially and otherwise. He then says, in a much more irritable manner: 'What is your definition of a scab?' I replied that my definition of a scab was that he was the dirtiest son of a bitch that lived. He then answered, saying, 'I consider a union man a dirtier son of a bitch than any scab,' at the same time advancing towards me, and raising his left hand as though to strike, and his right hand towards his right hip. The next I saw was Ganahl seizing his hands. He seized Elftman's right hand with his left, and Elftman's left hand with his right, and was directly between me and Elftman. The next I saw was Hennessy with a pistol at Ganahl's back, and then heard the shot. Elftman stepped back, and Ganahl fell forward to the ground. I turned towards Hennessy, and two shots were fired. The next I knew I was holding my hand, my hat was off my head, and I was holding my hand with the left. Then I saw Mr. Hennessy still with the gun in his hand pointing towards myself and Mr. Fancher, he advancing closer to me than he was at the time of the shooting. Hennessy said to Fancher: 'Stand back!'"

Max Elftman, a witness for the defendant, testified relative

to the difficulty as follows: "Before the shooting commenced, Mr. Hennessy, Antone, the man that was working for me, and myself were present—Antone Bosse. We three were upon the Elftman lease. Three men came up there. I didn't know at the time who they were, but I afterwards learned that it was a man by the name of Fancher, and Cole and Ganahl. Ganahl came up first, and then Cole, and then Fancher. None of them spoke to me or Mr. Hennessy. Mr. Cole spoke to the Italian. When they came up there, the Italian was throwing rock away from the top of the shaft to one side. I had just come out of the shaft, standing at the edge of it. Cole asked the Italian what wages he was getting. He replied: 'Five dollars a day.' Cole said: 'You want to be God damned sure that you are, or we will treat you as a scab and run you out of camp.' To that the Italian replied: 'I am getting five dollars a day.' Then I attracted Cole's attention by asking him what he meant by treating a man as a scab, and Cole said he would be blacklisted throughout the United States, so that he wouldn't be able to get any work anywhere. At the time he was talking his left hand was clenched, and he was very angry looking in the face. As Ganahl came up he seemed to be gritting his teeth, and had his hands clenched. Fancher was standing with his right hand near his right hip pocket. When I asked Cole what he meant by treating a man as a scab, he replied he would be blacklisted throughout the United States. I asked him for his definition of a scab. He said a scab is the dirtiest son of a bitch on earth. I said some of you so-called union men are the same. While I was saying that Cole advanced towards me and struck me. I warded off the blow, and kept on backing up, and Ganahl caught me around the back. I was backing up because I was afraid Cole would throw me in the hole. While I was backing up, Ganahl had hold of me. When Ganahl had hold of me Cole was striking at me. He was hitting me. Then Hennessy said: 'Keep back!' Then the shots were fired. They did not keep back when Hennessy spoke. Ganahl kept pulling me down, and Cole striking at me. Two shots were fired. I was not armed at the time. I did not put my hand up to my hip pocket when Cole was

talking to me, or at any time while they were there. I had a gun on the ground, in my coat pocket. My coat was about twenty feet south from the hole lying on some timbers. I had no gun in my possession."

There were other witnesses upon the part of the state corroborating the testimony given by the witness Cole, and, likewise, other witnesses upon the part of the defendant corroborating that of the witness Elftman. The important point of difference between the testimony of witnesses for the defense and those for the state, excepting the witness Antone Bosse, was as to the question whether the assault was first made by or upon Max Elftman, a question which will hereafter be considered with reference to certain assignments of error.

The bill of exceptions in this case contains 112 assignments of error, only a few of which we deem necessary to specifically consider at this time.

1. *The Juror Stenson:* Counsel for appellant very forcibly contends that the court erred in the denial of defendant's challenge to the juror Roger Stenson for implied bias. Counsel for the state, however, argues that, even if it be conceded that the examination of this juror showed him to have been disqualified, appellant cannot avail himself of the error, for the reason that his challenge was insufficient in matter of form, in that it did not specify the particular ground of implied bias upon which the challenge was based, and, secondly, because the defendant consented to have the juror Stenson sworn in to try the case while he yet had two peremptory challenges unexhausted, although all such challenges were used before the jury was finally secured. Upon the view we take of this case, a reversal of the order and judgment is required upon other assignments of error; and, as the questions presented relative to the challenge of the juror Stenson are not likely to arise upon a retrial of the case, we deem it unnecessary at this time to determine them.

2. *Dying Declaration:* The court admitted, over defendant's objection, as a dying declaration, an oral statement made by Ganahl a few minutes after the shooting. This is assigned as error, upon the ground that the proper founda-

tion for its admission had not been laid. It was shown by the testimony that the bullet which killed Ganahl struck him in the back below the left shoulder blade, and passed nearly through his body. He fell face downwards, and was unable to rise or turn over. A number of persons quickly gathered around him, and to them he said: "Boys, I am mortally wounded. I am all in. Turn me over, and I will tell you how it happened." These were the only expressions of the deceased indicating a belief upon his part that he was in extremis; that he was under a sense of impending death. There was other testimony as to his conduct and apparent condition at the time, and it was shown that death followed his statements within a little over two days. The expression "I am mortally wounded" would indicate a settled belief in the mind of the man that he had then no hope of ultimate recovery. The expression "I am all in" is one frequently made use of in this western country, and when used under the circumstances in question may, we think, be taken to have meant that the speaker considered his life was practically at its end. Every case where the question of the admission of dying declarations is involved must be determined upon its own peculiar facts and circumstances. It was the duty of the trial court to determine from all the facts and circumstances disclosed whether or not a proper foundation had been shown to admit the statement as a dying declaration. From the facts disclosed, we cannot say the trial court erred in this particular.

3. *Exclusion of Testimony:* A witness, Joseph Van Mohr, testified, on behalf of the defendant, that, on the night before the killing of Ganahl, Cole, Fancher, Ganahl, and one Alex Whitman, were in his tent, and that he then heard a conversation, which he detailed, in reply to the question, "What was said by those parties present at that time?" as follows: "I couldn't tell you that much, because I generally did not join in the conversation, because they spoke in low tones, and I am hard of hearing, and generally took a magazine and was reading all evening. I heard they were filling Alex Whitman with whisky. He was lying on the bunk. His bunk was on the west side of the tent, and I heard them

hollo into the conversation once in a while. Heard Whitman
hollo in. Mr. Ganahl was there at the time. Cole told him
to go down and get a bottle of whisky on his own credit.
All I could hear was to kill that son of a bitch of a dago
over there, and I once asked 'which dago is that, which dago
do you mean?' They identified him as the man—you know
the man that killed his horses going out to Manhattan. I
didn't know his name. Through the paper I saw his name
was Antone Bosse. * * * I knew there was going to be
trouble. On the evening, even during the daytime, I heard
it said that this Italian got to be prevented from going to
work in that camp, otherwise if that son of a bitch goes to
work, then we all can take our grip and get out of the camp.
We have no show then, and this Italian got to be prevented
from going to work by all means. * * * The Italian they
referred to that night is the same Italian that was right here
in court, and is around the court house now. I can point
him out now. I know his name is Antone Bosse. * * *
Well, they passed out, Cole and Fancher and Ganahl passed
out, and Alex Whitman stayed in the tent. * * * Mr.
Ganahl came back to the cabin that night about 10 o'clock.
Ganahl comes right in the front of the tent, and he called
Alex Whitman, and Ganahl said: 'Here, Alex, is another
bottle of whisky, and that powder at Elftman's house got to
go off to-night.' "

The record shows that after giving the foregoing testi-
mony the following questions, answers, objections, rulings,
and exceptions transpired with reference to the testimony of
this witness: "Q. What powder did he mean? A. There
was about fifteen boxes of powder stored under Elftman's
house— Mr. Pittman: We make the same objection. It has
nothing to do with the case at all, as to the powder under
Elftman's house, or that they brought him a bottle of whisky.
We don't care if they brought back a hundred. The Court:
Objection sustained. Mr. O'Brien: Exception. * * *
Q. What did Frank Ganahl tell Alex Whitman to do on the
night of January 26, 1906, if anything? Mr. Pittman: If the
court please, I object to that question as being immaterial,
incompetent, and irrelevant, what Ganahl told him to do;

that it is immaterial what Ganahl told him to do, and it does not tend to prove or disprove any of the issues in this case. * * * A. He said: 'Alex, here is another bottle of whisky, and I want you to go down to-night and blow that powder up and blow that Dutch son of a bitch to hell for hiring that scab.' Q. Whom did he mean, do you know? Mr. Pittman: I ask now that that question be stricken out, when he says that he should blow that Dutch son of a bitch to hell. In the first place, we don't know who the Dutch son of a bitch is, and, in the second place, it does not tend to prove or disprove any issues in this case, and it is simply asked to prejudice the jury, and it is irrelevant and incompetent. The Court: I sustain the objection. The answer is stricken out. Mr. O'Brien: We reserve an exception to the court's ruling. Mr. Pittman: I object to the question also, and move that it be stricken out. The Court: I permitted the question for the purpose of determining whether or not it was a legitimate question. I did not know, of course, what the answer of the witness would be, and, in view of the answer given by the witness, I don't believe the question is a proper one, and the question is ruled out. Mr. O'Brien: Exception to the court's ruling. Witness, continuing: I remember the killing of Frank Ganahl. I heard the shots. I saw Mr. Hennessy on the morning of the 27th of January of this year before the shooting of Frank Ganahl. I had a talk with him. I told him what had occurred the night before in my cabin. Q. What did you tell Mr. Hennessy occurred the night before the shooting? Mr. Pittman: Now, if the court please, I object to his answering the question, and I object to the question, on the ground that it is immaterial, irrelevant, and incompetent, does not tend to prove or disprove any issue in this case what he told him. The Court: As I understand it, there was nothing said against Mr. Hennessy in the cabin that night, so far as the evidence shows, in the presence of this man here. I am right, and, if I am not, I want to be set right. It was about Mr. Elftman, a Dutch son of a bitch, and that kind of a thing. I don't remember anything being said against Mr. Hennessy. Therefore I do not think it

would be proper to permit this witness to answer the question. Mr. O'Brien: If the court please, it is material and important, for this reason: As I stated.in my opening statement to the jury, and here yesterday to the court, we expect to prove as a matter of our defense that a conspiracy was entered into to commit various acts of violence by Ganahl, Cole, Fancher, and others; that there had been a great deal of trouble; and during this trouble that they had made threats against Elftman, and they had made threats against Hennessy, and when they came up there on the morning of January 27th Hennessy believed they came up there for the purpose of carrying out their threats, and some conspiracy which had been hatched the night before, of which he had been apprised that morning, and when he acted he acted under the belief that his own life was in danger, and that Max Elftman's life was in danger, whose life he had a right to defend—in fact, there had enough occurred to justify the fears of any reasonable man. The Court: The objection is sustained. Q. Did you at any time hear Frank Ganahl, or George Cole, or Walter Fancher make any threats against Mr. Hennessy? A. No, sir."

The rulings of the court above quoted have been assigned as error; but, before proceeding to consider these assignments we will refer to another assignment of error in reference to the testimony of the defendant, as all may appropriately be considered together. The defendant, in concluding an account of the killing of Ganahl, and of facts which led up to it, continued as follows: "At this time I knew threats had been made against the life of Max Elftman. On the morning of the shooting, Von Mohr came over to the tent, and he says: 'Hennessy, I want to speak with you.' Mr. Pittman: We will object to any threats that might have been made that he knew of against Max Elftman. Mr. Hennessy is on trial, and he claims self-defense. Any threat that might have been made against Elftman would not place him in danger and would be irrelevant and incompetent. Mr. O'Brien: It would be material for this purpose: Our defense is that he acted, not only in defense of himself, but that he acted in defense of Max Elftman. The law is that a person has the same

right to defend the life of another that he has to defend his
own life, and if he knew Elftman's life was in danger, and
threats were made against it, it would be relevant to show
the condition of his mind at the time. Mr. Pittman: If the
court please, you ruled on that this morning in the case of
Mr. Van Mohr. The Court: That was my ruling, and the
ruling stands. The objection is sustained. Mr. O'Brien:
Exception. Witness, continuing: 'At the moment of the
shooting, I believed that Cole, Fancher, and Ganahl, or some
of them, were about to kill Max Elftman, or to do him great
bodily injury, and when I shot I acted under the influence of
those fears. I certainly believed at the moment of the shoot-
ing that Cole, Fancher, and Ganahl, or some of them, intended
by violence or surprise to commit a felony. I believed that
they were going to murder Mr. Elftman, throw him into the
shaft, and then attack me. I acted entirely under the influence
of those fears.'"

The rulings of the court relative to the testimony of Van
Mohr and the defendant, above set forth, were error. It was
competent for the witness Van Mohr to testify fully with
reference to any threats made against the life of Max Elftman
by Ganahl, or by Cole or Fancher in association with Ganahl,
for such threats, even if uncommunicated, would be com-
petent for the purpose of aiding the jury in determining
who was the aggressor in the encounter which subsequently
occurred between Ganahl and Cole on the one hand, and
Elftman on the other. It was, however, of the very greatest
importance to the defendant to show that these threats were
communicated to him. His defense was based upon the
proposition that he took the life of Ganahl, not only to save
his own life, but to save that of Max Elftman. Both these
defenses were before the jury for their consideration. If
defendant believed as a reasonable man that Max Elftman
was assaulted and was in danger of losing his life or of
suffering great bodily harm at the hands of Ganahl, he had
the same right to defend Elftman as the latter would have to
defend himself, and whatever would be competent evidence
in Elftman's favor, if Elftman had done the killing, would
be competent in favor of the defendant. Mr. Bishop, in

speaking of the right to assist others in defense of their person says: "The doctrine here is that whatever one may do for himself he may do for another; * * * and on the whole, though distinctions have been taken and doubts expressed, the better view plainly is that one may do for another whatever the other may do for himself." (1 Bishop on Criminal Law, 877.)

Another writer uses this language: "A well-grounded belief that a felony is about to be committed will extenuate homicide committed in prevention, but not in pursuit, by a volunteer. * * * A *bona fide* belief that a felony is in process of commission, which can only be arrested by the death of the supposed felon, makes the killing excusable; but the belief must be honestly entertained, and without negligence, and, if non-negligent, it will excuse the homicide. * * * A person has a right to repel a felony threatened to be perpetrated either on himself or others. * * * The intentional infliction of death is justifiable, when it is inflicted by any person in order to defend himself or any other person from immediate and obvious danger of instant death or grievous bodily harm, if he, in good faith, and on reasonable grounds, believes it to be necessary when he inflicts it. * * * Self-defense will justify a person in defending those with whom he is associated, and in killing, if he believes life is in danger; and the right may be exercised by the servants and friends of the party assaulted, or any one present, in repelling an attempted felony." (Desty's American Criminal Law, 125*d*, 126, 126*a*.)

Kerr, in his work on the Law of Homicide, discussing the same subject, says: "It is well established that what one may do in his own defense, another may do for him, if he believes life is in immediate danger, or if such danger and necessity be reasonably apparent, provided the party in whose defense he acts was not in fault. * * * And it is the duty of a man who sees a felony attempted by violence to prevent it if possible. This is an active duty, and hence he has a legal right to use the means necessary to make the resistance effectual. If A. be unlawfully assaulted by B., and his life thereby endangered, he may, by reason of not being

in fault, defend it even to the extent of taking the life of the person who is in fault; and, as the right is a natural one, rules of law restricting it must, in order that it may still be effective, be adapted to his character and nature. He may therefore act upon appearances, if he acts reasonably; and if assailed by another, and he believes, and has reasonable ground to believe, that his life is thereby endangered, he may even take life in its apparent necessary defense. So great, however, is the law's regard for human life, that he must be careful and not violate the restriction that law and society have placed upon this right of self-defense, to wit, he must act from necessity, and not be in fault." (Kerr on Homicide, 168.)

See, also, *Stanley* v. *Commonwealth*, 86 Ky. 440, 6 S. W. 155, 9 Am. St. Rep. 305; *In re Neagle*, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55; *People* v. *Travis*, 56 Cal. 251; *State* v. *Felker*, 27 Mont. 456, 71 Pac. 668; Wharton on Homicide, 532; text and authorities cited in 21 Cyc. 826, and 21 Am. & Eng. Ency. Law, 207; Comp. Laws, 4001, 4680.

Persons acting in defense of others are upon the same plane as those acting in defense of themselves. Therefore, every fact which would be competent to establish justification in the one case would, for the same reason, be competent to establish it in the other. (4 Elliott on Evidence, note to section 3041*s*; *State* v. *Felker*, 27 Mont. 451, 71 Pac. 668; *People* v. *Curtis*, 52 Mich. 616, 18 N. W. 385; *Wood* v. *State*, 128 Ala. 27, 29 South. 557, 86 Am. St. Rep. 71; *State* v. *Austin*, 104 La. 409, 29 South. 23; *Foster* v. *State*, 102 Tenn. 33, 49 S. W. 747.) Had Elftman killed Ganahl in the encounter which occurred, it would have been competent for him to have shown in his defense that a conspiracy had been entered into by Ganahl and others to take his life or to do him great bodily harm, or that Ganahl alone had made threats to do such violence, and for the same reason testimony of this nature would be competent in Hennessy's defense; the latter claiming to have done the killing in the necessary defense of Elftman.

The record upon appeal contains numerous other assignments of error relative to rulings of the court upon the admissibility of testimony. In many instances the court

subsequently admitted testimony which it had previously
ruled as inadmissible, and generally in such cases the error,
if any, would be cured.   Upon a retrial of this case, counsel
for defendant will have ample opportunity to call the trial
court's attention to what he deems error in its rulings other
than those herein specifically considered, and if errors have
been made they will, doubtless, be corrected.

4.   *Instructions:*  Numerous exceptions were taken to rul-
ings of the court in giving and refusing instructions, some
of which warrant our consideration at this time, to the end
that the trial court may be aided in avoiding error upon
another trial.

Defendant's requested instruction No. 11, refused by the
court, was as follows: "If, after a consideration of the whole
case, any juror should entertain a reasonable doubt of the
guilt of the defendant, it is the duty of such juror, so enter-
taining such doubt, not to vote for a verdict of guilty, nor
to be influenced to so vote, for the single reason that a
majority of the jury should be in favor of a verdict of
guilty."   This instruction was, doubtless, taken from the case
of *People* v. *Dole*, 122 Cal. 495, 55 Pac. 585, 68 Am. St. Rep.
50, concerning which instruction the court in that case said:
"This is a correct statement of the duty of a juror, and
should have been given.   If any juror needed an instruction
upon this point, it was harmful to refuse it; if no juror
needed the instruction, it would have been harmless to give it."
While this requested instruction is, in the abstract, a correct
statement of the duty of an individual juror, nevertheless,
it does not, we think, clearly express the whole duty of a
juror, and, if it were the only instruction given in this
regard, might mislead some juror into the belief that it was
his duty to hold strenuously to impressions or convictions
which might be in fact based upon an erroneous view or a
misconception of the law or the evidence in the case, and
which the juror might, upon discussion with his fellows,
readily see were untenable.   It is the duty of each juror to
consult with his fellows and to consider their views, to the
end that each may aid in arriving at the truth.   Ultimately,
of course, each juror should act upon his own convictions,

but this is what his oath enjoins on him to do. Reliance must necessarily be placed upon the honor and intelligence of jurymen, and it may, we think, be left to the sound discretion of the trial judge whether or not, after he has given the jury general instructions covering their duties, it is necessary to point out to the individual juror his particular duty and obligation. In any event, if the instruction in question be given, it should be so modified as to embody the views in reference thereto herein expressed.

The Supreme Court of California, in a comparatively recent case, refused to reverse where this instruction was refused, holding that the jury was sufficiently instructed as to its duties in other general instructions. The court commented upon the instruction in question as follows: "Appellant contends that the refusal to give this instruction was error justifying a reversal, and relies upon *People* v. *Dole*, 122 Cal. 486, 55 Pac. 581, 68 Am. St. Rep. 50, in support of his contention. The court there says that the instruction correctly stated the duty of a juror and should have been given, but adds: 'If any juror needed an instruction upon this point, it was harmful to refuse it; if no juror needed the instruction, it would have been harmless to give it.' But that case was not reversed solely or principally upon the refusal to give that instruction, but mainly upon other errors of the trial court referred to in the opinion in that case. In the later case of *People* v. *Rodley*, 131 Cal. 259, 63 Pac. 358, this court says on this subject: 'Juries are impaneled for the purpose of agreeing upon verdicts, if they can conscientiously do so. They are admonished at each recess of the court not to form an opinion as to the merits of the case until it shall be finally submitted to them, and when it is so submitted it is the duty of jurors to deliberate and consult together with the view of reaching an agreement, if they can, without violence to their individual understanding of the evidence and instructions of the court. They should not be lectured by the court to make them strong and steadfast in their individual opinions; neither should they be exhorted to reach an agreement, and while it is probably true that "each juror should decide the matter for himself," yet he should do so only after a consideration of the

case with his fellow-jurors, and he should not hesitate to 'sacrifice his views or opinions of the case' when convinced that they are erroneous, even though in so doing he defer "to the views or opinion of others." ' " (*People* v. *Perry*, 144 Cal. 754, 78 Pac. 284.)

The Supreme Court of Montana, discussing this same instruction, in *State* v. *Hurst*, 23 Mont. 496, 59 Pac. 915, said: "An examination of the record in this case shows that the court carefully instructed the jury as to their duties in instructions Nos. 9, 13, 17, and 38. We agree that the instruction as asked is a correct statement of the law as to the duty of a juror, but we also think that the general instructions submitted in this case were amply sufficient to guide the individual jurors in the performance of their duties under the law. The court had heard the individual jurors examined. It had witnessed their behavior during the progress of the trial. It was discretionary with the court to instruct the jury more specifically with reference to their individual duties, the exercise of this discretion to be determined by the observations made by the court during the examination of the jurors, and their conduct during the trial. If the court thought proper to give the instruction, it was proper to give it. On the other hand, if the court thought the jury did not require the instruction, it was not abuse of discretion to refuse to give it. There is some conflict of authority as to whether the court should instruct the jury in matters of this kind. We agree in the main with what the Supreme Court of Iowa said on the subject of such instructions in *State* v. *Hamilton*, 57 Iowa, 596, 11 N. W. 5: 'Of course each juror is to act upon his own judgment. He is not required to surrender his convictions unless convinced. He may be aided by his fellow-jurors in arriving at the truth, but he is not to find a verdict against his judgment, merely because the others entertain views different from his own. But a jury need not be advised of so simple a proposition. The usual method of instructing upon the measure of proof required in criminal cases is sufficient.' " To the same effect is *State* v. *Howell*, 26 Mont. 6, 66 Pac. 291.

Defendant's requested instruction No. 14, refused by the

court upon the ground that it had been given already, reads as follows: "The law makes it the duty of every one, who sees a felony attempted by violence, to prevent it, if possible, and allows him to use the necessary means to make his resistance effectual. One may kill in defense of another under the same circumstances that he would have the right to kill in defense of himself." This instruction was a correct statement of the law, and it was of the very highest importance to the defendant that the jury be instructed upon the principle of law which it embodied, for it was of the very essence of his defense. We are unable to find that this instruction was clearly given in any other instruction. Counsel for the state contend that it was embodied in defendant's instruction No. 12, which was substantially the statutory definition of justifiable homicide. A trained legal mind may be said to be able to evolve the principle of law stated in the refused instruction from the definition contained in instruction No. 12, but we doubt very much if the ordinary juryman, unfamiliar with fine legal distinctions, would be able to readily make such an analysis. Whether the refusal of this instruction would amount to reversible error in this case we need not determine. It is sufficient to say that the instruction was proper, and should have been given.

Defendant's requested instructions Nos. 15, 16, 17, 21, 22, and 23, refused by the court, were, doubtless, offered for the purpose of applying abstract principles of law to facts as testified by witnesses for the defendant. If the jury believed the testimony of the defendant's witnesses, instructions of the character requested would enable the jury to more readily apply the law to the facts which such evidence might be deemed to have established. These requested instructions are indorsed "Refused" by the trial judge, without giving any reason therefor, and we are therefore at a loss to know upon what theory he acted in denying them. Counsel for the state does not question their correctness, but claims it was not error to refuse them, for the reason that other instructions covered the same points—referring to certain instructions which simply embodied abstract principles of law. It is

usual in criminal cases to give instructions both for the state and for the defendant which apply abstract legal principles to both the state's theory. of the case and the defendant's theory of the case, as such theories respectively have been supported by evidence, in order that, when the jury has agreed upon the facts of the case, the law governing those facts shall be stated to them in concrete form. To refuse instructions of this character is error. No question having been raised as to the entire correctness of these instructions as to matter of form, we have, in our consideration of them, treated them as correct; but whether or not all or some of them are subject to some modification we express no opinion.

Error is assigned in the giving of the state's requested instruction No. 6, which reads as follows: "The court instructs you that if you believe from the evidence that, at the time Cole, Fancher, and Ganahl went to the Elftman lease, they went there in an orderly and peaceable manner, for the purpose of maintaining a rate of wages, and to induce Antone Bosse, in an orderly and peaceable manner and without violence, to work for that wage, their purpose was a lawful purpose under the laws of this state." Counsel for the state contend that this instruction stated the law and was applicable to this case because of the provisions of section 110 of the crimes and punishments act (Comp. Laws, 4751). This section defines the crime of conspiracy, but the concluding part of the section contains the following proviso: "That no part of this act shall be construed in any court of this state to restrict or prohibit the orderly and peaceably assembling or coöperation of persons employed in any profession, trade, or handicraft for the purpose of securing an advance in the rate of wages, or compensation, or for the maintenance of such rate."

We are unable to see how the provisions of the section quoted could authorize the giving of the instruction in question in this case. It was competent to show the purpose which occasioned Ganahl, Cole, and Fancher to go upon the Elftman lease, and how they proposed to accomplish such purpose, for that would be a circumstance to be considered by the jury in a determination of the disputed question

whether Cole and Ganahl first assaulted Elftman, or whether Elftman was the aggressor. (*People* v. *Thomson*, 92 Cal. 511, 28 Pac. 589.) The instruction given, however, might lead the jury to believe that the laws of this state gave to Cole, Ganahl, and Fancher some special privilege because of the fact, if the jury believed it to be a fact, that their purpose in going upon the Elftman lease was to accomplish in an orderly and peaceable manner the maintenance of a rate of wages. The proviso which forms a part of section 110 of the crimes and punishments act, *supra*, relates solely to the construction to be placed upon the preceding portion of the section. By the terms of this proviso the section of the act in question is not to be construed by the courts so as to restrict or prohibit the orderly and peaceably assembling or coöperation of persons employed in any profession, trade, or handicraft for the purpose of securing an advance of the rate of wages, or compensation, or for the maintenance of such rate. The purpose of the proviso was precautionary to prevent the possibility of courts construing lawful acts as unlawful. It was never intended as a grant of additional power or privilege, and especially the privilege of entering in and upon the property of another to carry out a purpose, no matter how lawful or commendable the same might otherwise be. We think this instruction would tend to confuse the jury upon a legal question not involved in this case, and the giving of the same was error.

The record contains a number of other assignments of error relative to the refusal and allowance of instructions, but we think we have covered the main questions which have occasioned difficulty in the trial of the case. Whether or not error was committed in the matter of assignments not specifically considered, we believe the trial court will have no serious difficulty in their proper disposition when again presented.

For the reasons heretofore given, the judgment and order of the trial court are reversed, and the cause is remanded for a new trial.