[No. 1710.]

## THE STATE OF NEVADA, RESPONDENT, *v.* ALBERT T. JACKMAN (INDICTED UNDER THE NAME OF JOHN THOMPSON), APPELLANT.

1. HOMICIDE—ADMISSIBILITY—THREATS. Where, on a trial for murder, self-defense is pleaded, threats by decedent to kill defendant the first time he saw him, made within an hour of the shooting, are admissible, though they were not communicated to defendant, on the issue of who was the aggressor.

2. CRIMINAL LAW—APPEAL—HARMLESS ERROR—ERRONEOUS EXCLUSION OF EVIDENCE. An instruction on a trial for murder, wherein self-defense was pleaded, not to consider evidence of threats which were not communicated to defendant, was none the less prejudicial error because the threats were testified to by a prostitute; her testimony, no matter what her character, being admissible for such weight as the jury might give it.

APPEAL from the District Court of the First Judicial District of the State of Nevada, Esmeralda County; *M. A. Murphy*, Judge.

Albert T. Jackman, indicted under the name of John Thompson, was convicted of murder in the first degree, and from the judgment and order denying motion for a new trial, defendant appeals. **Reversed,** and remanded for a new trial.

The facts sufficiently appear in the opinion.

*Thompson, Morehouse & Thompson*, and *William Woodburn*, for Appellant.

*R. C. Stoddard*, Attorney-General, for Respondent:

I.   The following instruction asked by the state: "Threats, however deliberately made, do not justify an assault and battery, much less the taking of a life of the party making them, and evidence of threats previously made, if any threats were made, but not communicated to the defendant, should not be considered by the jury in arriving at their verdict"— does not conflict with the instruction given at the request of defendant, and given by the court of its own motion. Under the evidence in the case it was a proper instruction, as the evidence shows that the threat was not communicated to the defendant; therefore *People* v. *Scoggins*, 37 Cal. 676, cited by appellant, is not in point; on the contrary, it is held in

*People* v. *Scoggins*, 37 Cal. 676, *People* v. *Arnold*, 15 Cal. 476, and *People* v. *Iams*, 57 Cal. 115, that it is not error to exclude evidence of uncommunicated threats made by the deceased.

*William Woodburn*, for Appellant, in reply:

I. If the defendant was in imminent danger of his life or great bodily harm, it was not incumbent on him to fly for safety, but he had a right to stand his ground and slay his adversary. (Hughes, Cr. Law & Proc. 2445, 2446; Greenl. Ev. 850; *People* v. *Thomson*, 92 Cal. 511; *People* v. *Hecker*, 109 Cal. 463; *People* v. *Gonzales*, 71 Cal. 569; *People* v. *Ye Park*, 62 Cal. 204; *People* v. *Farley*, 124 Cal. 597.) Under the plea of self-defense the sole and all-important question at issue was whether the defendant or John Moritz, the deceased, was the aggressor in the encounter in which the latter lost his life. The threat of deceased to kill the defendant on sight, testified to by Myrtle Smith, but not communicated to defendant, should have been submitted to the jury for consideration, and its exclusion by the court was reversible error.

*Thompson, Morehouse & Thompson*, for Appellant, in reply:

I. In complaining of the instruction asked by the state, and given by the court, the point is not that a threat communicated or uncommunicated is a defense or excuse for the defendant to shoot or kill the deceased, but that such threat, although uncommunicated, is admissible as testimony, tending to show who was the aggressor, who commenced the affray, who was most likely to cause the difficulty. Reading the testimony, it will be seen that no person was present at the time when the trouble commenced but the defendant and the deceased. The defendant claims he shot in self-defense, that Moritz attempted to draw a pistol. The defendant was not angry, was not seeking the deceased; but some time within an hour prior to the shooting we find that the decedent said: "I am going to kill the son of a bitch the first time I see him." Now, the evidence shows that the first time the deceased saw the defendant was when the shooting took

place; that the deceased was armed; that he came down the
street on his bicycle, approached toward the defendant, and,
as the defendant says, made an attempt to draw his pistol,
or, to use the language of the defendant: "He rode almost to
me, jumped off his bicycle, and I would not say for sure
whether he leaned his bicycle up against a post or the build-
ing; he walked in front of me, headed me off.  I asked him,
'What do you mean?  Do you intend to make another gun
play like you tried at the dance hall?'  He answered, 'Yes
(uttered an oath), and I am going through with it.'  As he
said that I stepped back; he threw his hand back to his hip
like that (witness illustrating by throwing his left hand back
to hip), and as he did so I shot him.  *  *  *  I thought he
was going to shoot me; that he was going to kill me if I gave
him the chance."  Here we have the true situation, and we
ask why did the deceased get off his bicycle, why head off
the defendant?  What was the deceased doing there?  Was
he not hunting the defendant?  Why did he put his hand
to the hip pocket?  Why did he say, "Yes, and I am going
through with it?"  Now, of course, this is the testimony of
the defendant, and subject to be weighed as to its truth or
falsity, but when we find that, less than an hour before, the
decedent had said: "I am going to kill the son of a bitch
the first time I see him," and we know that this was the
first time he saw the defendant, certainly this threat becomes
material, and elucidates the acts and conduct of the deceased,
showing that his express purpose was being carried into
execution, and, while it is no ground excusing the defendant,
yet it corroborates and shows clearly that the defendant was
not the aggressor; that he was in fact in danger; and that,
had he not acted, he, himself, would have been shot.  It
shows the true situation of the parties; and, as said in
*People* v. *Iams*, 57 Cal. 120, "But while mere words will not
justify an assault, they may possess significance as illustrat-
ing or explaining the subsequent acts of the parties, and
determining who was the first aggressor."  We offered this
testimony for that purpose.)  It was not objected to.  We
carefully limited the testimony to that purpose alone, by
our instruction, and the court gave it at our request, in

harmony with *Wiggins* v. *People*, 93 U. S. 465, where the court says: "In a trial for homicide, where the question whether the prisoner or the deceased commenced the encounter which resulted in death is in any manner in doubt, it is competent to prove threats of violence made against the prisoner by the deceased, although not brought to the knowledge of the prisoner." Now, then, if the prosecution are. willing to admit that the deceased commenced the encounter, then certainly the defendant was entitled to an acquittal upon his plea of self-defense; but if they deny that point, then the defendant has the right to have the jury pass upon testimony in the light of this threat, so that the jury may know the intent and purpose of the deceased to make a deadly assault on sight.

By the Court, SWEENEY, J.:

Defendant was indicted for killing John Moritz at Goldfield, Nevada, on September 16, 1906, tried and convicted of murder in the first degree in the District Court of the First Judicial District of the State of Nevada in and for the County of Esmeralda, and sentenced by the court to be hanged by the neck until dead. From an order denying defendant's motion for a new trial, and from the final judgment convicting defendant of murder in the first degree, defendant appeals.

It appears from the testimony that the defendant, 21 years of age, a gambler by occupation, about 3 o'clock a. m. of the 16th day of September, 1906, was crossing the main street of Goldfield on his way to the Royal Café for breakfast, when he saw the deceased, John Moritz, aged 23, whose business appeared to be that of a messenger in the tenderloin district, coming down the sidewalk on a bicycle, when, according to the defendant, "he rode almost to me, jumped off his bicycle, and I would not say for sure whether he leaned his bicycle up against a post or the building. He walked down in front of me, headed me off. I asked him: 'What do you mean, do you intend to make another gun play like you tried at the dance hall?' He answered: 'Yes (uttered an oath), and I am going through with it.' As he said that I stepped

back, he threw his hand back to his hip like that (witness illustrating by throwing his left hand back to hip), and as he did so I shot him. * * * I thought he was going to shoot me; that he was going to kill me if I gave him the chance. I would not have shot him otherwise, if I did not think he was going to shoot me. * * * I shot once; that is, two shots were fired from the gun. One was my intention and purpose. The first I shot on purpose. After the first shot he staggered, and I cocked my gun, that is, to see if he was going to pull his gun to shoot or kill me. I stepped sideways toward the Mohawk, and as I did he fell. As he fell my finger was on the trigger and my thumb cocking the hammer. I had the trigger pulled back with my finger, and as he fell my thumb slipped off the hammer, and the gun exploded the second time. * * * I did not fire the second shot intentionally."

There were no witnesses to the commencement of the tragedy. It appears further from the testimony that the defendant about 1 o'clock of the same morning was in company with one Sherman Crumley, when Crumley was accidentally run into by deceased on a bicycle in an alley in the redlight district of Goldfield, whereupon Crumley and Moritz had a wordy argument, culminating in the deceased, Moritz, drawing a revolver and ordering Crumley to "stand back." A revolver was found on the person of the deceased when brought to the hospital after the shooting. To the indictment charging defendant with murder in the first degree, defendant pleaded "not guilty," and interposed a plea of self-defense.

During the progress of the trial, a prostitute by the name of Myrtle Smith was introduced as a witness on the part of the defense, and testified as follows: "By Mr. Morehouse: Q. Where do you reside? A. Goldfield. Q. Did you know in his lifetime a young man by the name of Moritz. A. Yes, sir. Q. Where did you know him? A. In Goldfield. Q. Did you see him on or about the morning of the 16th of September? A. Yes, sir. Q. Where? A. Down to my house. Q. What was he doing there? A. He brought me a lunch down to my house. Q. About what time was this? A. Some

time between 2 and 3 o'clock; I could not exactly tell the time. Q. In the morning? A. In the morning. Q. On that occasion did he make any remark of and concerning Albert Jackman, know as Jack Thompson? A. Yes, sir. Q. Will you state to the jury what he said, and how he came to say it? A. Yes, sir. He brought a lunch from the Palm restaurant to me. He went back and got one for Miss Florence and came back with Miss Florence's lunch and was to take my empty dishes. I heard him in my room, and stepped into the room, and he said: 'For Christ's sake, don't scare me.' I said to him: 'Why are you so frightened?' He said: 'Well, I had trouble down the street with Jack Thompson.' And made the remark: 'I am going to kill the son of a bitch the first time I see him.'"

The court gave the following instruction to the jury, asked for by the state, which is assigned as error by the defendant: "Threats, however deliberately made, do not justify an assault and battery, much less the taking of the life of the party making them, and evidence of threats previously made, if any threats were made, but not communicated to the defendant, should not be considered by the jury in arriving at their verdict."

The effect of this instruction was to preclude the jury from considering the testimony of Myrtle Smith testifying to a threat made by the deceased less than an hour before the shooting against the life of the defendant. The evidence of Myrtle Smith testifying to the threat made by the deceased against the life of the defendant, under the circumstances in this case, though uncommunicated to the defendant, was clearly admissible and of such vital importance to the defendant that the instruction of the court, commanding the jury not to consider this threat in arriving at their verdict, was of such a prejudicial nature that this case must be reversed. In cases of self-defense, where the question is doubtful as to who was the aggressor, as is the fact in the present case, there being no witnesses to the homicide, evidence of threats made against the life of a defendant preceding the affray, even though uncommunicated, are admissible. In the present case, a material point at issue was: Who

was the aggressor? The defendant says the deceased was the aggressor; that he shot the deceased when the latter "threw his hand back into his hip pocket" for the purpose, as defendant believed, according to his testimony, of killing him if he got the chance. No one was present at this fatal moment but the deceased and the defendant. If this threat testified to by Myrtle Smith was true, and was made by the deceased, how vitally important this fact then became to the defendant when the testimony discloses that the first time the deceased saw the defendant after the making of this threat was the very time when the shooting took place. The jury were considering whether or not the defendant, according to his plea of self-defense, was justified in defending his life at the time he shot Moritz. The determination of this fact by the jury as to who was the aggressor in this case, and in most if not all murder cases wherein the plea of self-defense is interposed, is almost decisive of the innocence, or, if guilty, the degree of guilt of the defendant, and, in the determination of this important fact, all threats against the life of the defendant by the deceased, even though uncommunicated, are admissible, and the exclusion of this evidence, so vitally important to the defendant, is reversible error. (*State* v. *Hennessy*, 29 Nev. 320; *People* v. *Arnold*, 15 Cal. 481; *People* v. *Scoggins*, 37 Cal. 676; *People* v. *Alivtre*, 55 Cal. 263; 1 Wigmore on Evidence, 110; *Stokes* v. *People*, 53 N. Y. 174, 13 Am. Rep. 492; *Wilson* v. *State*, 30 Fla. 242, 11 South. 556, 17 L. R. A. 654.)

The threat, as testified to, was: "I am going to kill the son of a bitch the first time I see him." The shooting, according to the testimony, took place about 3 o'clock a. m., and this threat is testified to as having been made within an hour previous to the shooting. In arriving at their verdict, the fact of who was the aggressor became of vital importance to the jury in determining the innocence or degree of guilt of the defendant, and one which they must necessarily have passed upon in arriving at their verdict. The jury in the present case were instructed, in effect, not to consider the testimony of Myrtle Smith because the threat, being uncommunicated, was inadmissible, and the jurors, whose duty it

is to be governed by the instructions given by the court as to the law, we must presume acted in accordance with their obligation, and did not consider this testimony. It will not do to say that the jury did not believe Myrtle Smith because the threat testified to in her testimony was expressly ruled out by the court. Her testimony, no matter what her character, was admissible for such weight as the jury might give to it, and, no matter from what source the testimony came, the defendant was entitled to have this testimony passed upon by the jury.

In the case of *State* v. *Hennessy* (very recently determined), 29 Nev. 320, 90 Pac. 225, this court, in passing upon testimony of uncommunicated threats assigned as error, said: "Such threats, even if uncommunicated, would be competent for the purpose of aiding the jury in determining who was the aggressor in the encounter which subsequently occurred between Ganahl and Cole, on the one hand, and Elftman, on the other."

The rule as to the admissibility of uncommunicated threats made by the deceased against the life of the defendant, where the plea of self-defense is interposed, is succinctly stated in the late work of Wigmore on Evidence, vol. I, sec. 110, as follows: "Where, on a charge of homicide, the excuse is self-defense, and the controversy is whether the deceased was the aggressor, the deceased's threats against the accused are relevant. The deceased's design to do violence upon the defendant is of some value to show that on the occasion in question he did carry out, or attempt to carry out, his design. Moreover, it is the fact of his design, irrespective of its communication to the defendant, that is evidential."

The judgment and order of the trial court are reversed, and cause remanded for a new trial.